UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Anita M. Jacobs,                                    Civ. No. 08-431 (JMR/JJK)

            Plaintiff,

v.                                          REPORT AND RECOMMENDATION

Michael J. Astrue,
Commissioner of Social Security,

            Defendant.

Fay E. Fishman, Esq., Peterson & Fishman, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

        Pursuant to 42 U.S.C. § 405(g), Plaintiff Anita M. Jacobs seeks judicial

review of the final decision of the Commissioner of Social Security ("the

Commissioner"), who denied Plaintiff's application for disability insurance

benefits.  This matter is before this Court for a Report and Recommendation to

the District Court on the parties' cross-motions for summary judgment.  *See* 28

U.S.C. § 636 and District of Minnesota Local Rule 72.1.  For the reasons stated

below, this Court recommends that Plaintiff's Motion for Summary Judgment

(Doc. No. 24) be granted and the case be remanded for further proceedings, and

that Defendant's Motion for Summary Judgment (Doc. No. 23) be denied.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff filed an application for disability insurance benefits in 2003, alleging a disability onset date of September 19, 1997.  (Tr. 74.)  The application was denied both initially and on reconsideration.  (Tr. 29-32, 33-35.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on October 11, 2005.  (Tr. 949.)  The ALJ issued an unfavorable decision.  (Tr. 15-26.)  Plaintiff sought review of the ALJ's decision by the Appeals Council, but the Appeals Council denied the request for review.  (Tr. 9-13.)  The ALJ's decision therefore became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.  On February 20, 2008, Plaintiff filed the instant action with this Court.  The parties thereafter filed cross-motions for summary judgment.

### B.    Medical Treatment Predating Plaintiff's Date-Last-Insured

Plaintiff is a 40 year old woman who lives with her husband and two children.  (Tr. 952.)  She has a high school education and has completed beauty college.  (Tr. 953.)  She also studied to become a veterinary assistant, but did not complete the program.  (*Id.*)  Plaintiff testified that she cannot work due to pain and medication.  (*Id.*)

A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166,

1168 (8th Cir. 1984).  Here, Plaintiff's insured status expired on December 31, 2001.  (Tr. 29, 31, 33.)  The record in this case shows that Plaintiff went through extensive medical treatment during the period between Plaintiff's alleged onset of disability in 1997, and her date-last-insured, December 31, 2001.  The following is a detailed history of Plaintiff's physical and psychological pain reports to many physicians during this period.  The history shows Plaintiff was prescribed an astonishing array of medication during this time.

On July 3, 1997, Plaintiff was treated for neck pain and a migraine headache.  (Tr. 328.)  She had a history of similar pain, but she reported that it had not been this bad for the few years before 1997.  (*Id.*)  She was given Demerol and Vistaril, which helped her headache.  (*Id.*)  Her neck pain had not resolved after she was treated with Ibuprofen and Flexeril.  (*Id.*)  Plaintiff was then given Toradol, and later was given Stadol, which resulted in mild improvement.  (*Id.*)  Plaintiff was also given a prescription for Vicodin.  (*Id.*)

On February 13, 1998, Plaintiff had an anterior decompression fusion at C5-6 to treat neck pain.  (Tr. 180.)  Prior to surgery, an MRI had shown cervical spondylosis at the C5-6 level with compromise of the left half of the spinal canal. (*Id.*)  Plaintiff's pain decreased during the immediate weeks post surgery. (Tr. 188.)  But in early March 1998, her pain worsened again, and she was prescribed Vicodin.  (*Id.*; Tr. 321.)  Plaintiff started physical therapy in March, and thereafter her pain increased more.  (*Id.*)  In March and April 1998, Plaintiff

3

visited the emergency room four times for treatment of migraines and neck pain. (Tr. 314-19, 321-22.)  In early April, an MRI of her cervical spine showed no evidence of recurrent disc herniation.  (Tr. 318.)  However, during an examination in April 1998, Plaintiff had palpable muscle spasm.  (Tr. 314.) During this time period, Plaintiff was on or prescribed the following:  Percocet, Vicodin, Flexeril, Valium, Stadol, Vistaril, Orudis, Demerol, Toradol, Trazodone, and Decadron.  (Tr. 314-22.)

In May 1998, Plaintiff went to the emergency room for what was described as the worst headache of her life associated with neck stiffness.  (Tr. 308, 312.) A spinal tap was performed, and the results were within normal limits.  (Tr. 308.) Plaintiff was, however, admitted overnight for pain control.  (Tr. 313.)  During the course of her stay, Plaintiff was treated with Percocet, Flexeril, Demerol, Vistaril, Phenergan, morphine, Versed, and Valium.  (Tr. 308-13.)  The next day, Plaintiff was referred to Dr. Zohrah Mahdavi for a neurology consultation.  (Tr. 304-05.) Plaintiff reported to him that she has had migraines since childhood, and that she was having headaches every other day.  (Tr. 304.)  Dr. Mahdavi recommended a trial of Neurontin as a prophylactic medication.  (Tr. 305.)

In early June 1998, Plaintiff again visited the emergency room.  (Tr. 301.) This time, Plaintiff complained of a mild headache and back and neck pain, which apparently was attributed to an altercation with her sister in which Plaintiff's hair was pulled from behind her head.  (Tr. 301.)  An x-ray of her

4

cervical spine showed a stable C5-6 fusion, but straightening of the spine suggested muscle spasm.  (Tr. 303.)  Plaintiff was treated with Demerol and Ativan.  (Tr. 302.)  In late June 1998, Plaintiff was treated in the emergency room for neck and back pain again.  (Tr. 298-300.)  This time, it was after Plaintiff slipped and fell.  (Tr. 298.)  An x-ray of her cervical spine showed no evidence of fracture.  (*Id.*)  Plaintiff was treated with Demerol, Vistaril, and Versed, and was given a prescription for Vicodin.  (Tr. 298-99.)

Plaintiff was then evaluated for physical therapy.  (Tr. 199-201.)  During her initial evaluation, she reported that after her surgery her pain spread into her arms, her left lower extremity, and her feet.  (*Id.* at 199.)  The pain was aggravated by prolonged walking, standing, sitting, sleeping, reaching, lifting, and personal grooming of her head and hair.  (*Id.*)  She also reported that she had migraine headaches, which had not been helped by physical therapy in the past, and that her stress level was high due to being frustrated with her pain and trying to raise two young children.  (*Id.*)  Upon examination, Plaintiff had significant lordosis of the low back.  (*Id.*)  In addition, palpation produced a significant number of tender points to the cervical spine, right upper extremity, low back, and right hip.  (Tr. 199-200.)  Plaintiff also exhibited a reduced quality and symmetry of motion.  (Tr. 200.)  The physical therapist recommended that Plaintiff engage in physical therapy twice a week.  (Tr. 201.)

In October 1998, Dr. Richard Foreman of Neurological Associates of St. Paul saw Plaintiff and recommended against her use of Stadol due to its severely addicting properties and marked side effect profile.  (Tr. 502.)  In a follow-up letter to Dr. James Nolan, Dr. Foreman's notes that Plaintiff's husband had noted that Plaintiff had been having marked mood swings in the week prior to Plaintiff's appointment with Dr. Foreman.  (Tr. 503.)  Dr. Foreman conducted head imaging, and Plaintiff's MRI was normal.  (Tr. 503, 508.)

In November 1998, and in January 1999, Plaintiff again went to an emergency room for treatment of migraines and neck pain.  (Tr. 287-92, 297.)  In early April 1999, Plaintiff went to an emergency room for right-sided neck pain.  (Tr. 285-86.)  Earlier that day, Dr. Nolan diagnosed her with acute wryneck and treated her with Percocet and Flexeril.  (Tr. 285.)  On examination in the emergency room, she had marked muscle spasm.  (Tr. 285.)  Dr. Lawrence Scheuer treated her with Buprenex and Vistaril.  (*Id.*)

On April 13, 1999, Dr. Foreman saw Plaintiff at his office.  (Tr. 501.)  Plaintiff complained of feeling very jittery and depressed.  (*Id.*)  Plaintiff at that time had been taking Depakote.  Dr. Foreman then wrote to Dr. Nolan suggesting that Plaintiff might be a candidate for an antidepressant with anti-anxiety qualities.  (*Id.*)

In July 1999, Plaintiff had a CT scan of her head with normal results.  (Tr. 341.)  She then had an MRI of her lumbar spine on August 5, 1999.

(Tr. 340.)  The MRI indicated minimal degenerative changes in the facet joints

bilaterally at L5-S1.  (*Id.*)

In November 1999, Plaintiff complained to Dr. Samuel Yue, a doctor at

Bethesda Pain Center, in St. Paul, Minnesota, of continued pain.  (Tr. 225.)  At

that time, Dr. Yue diagnosed Plaintiff with the following:

> 1.  Cervical neck pain, treated with fusion, presently
> resolved.
>
> 2.  Fibromyalgia with chronic lower back pain, cervical
> neck pain and stiffness and fatigue of greater than three
> months duration, 16 of 18 tender points being positive,
> headache, TMJ, CNS disturbance of sleep, cognitive
> and affective dysfunction, irritable bowel, irritable
> bladder, tubal ligation, PMS, lymphedema, Raynaud's
> phenomenon and restless legs.

(Tr. 225.)  Dr. Yue recommended that Plaintiff take Soma in addition to her other

medications.  (*Id.*)

Plaintiff again visited emergency rooms for treatment of headaches and

neck pain in December 1999, February 2000, and March 2000.  (Tr. 274-79,

481-82.)  During those visits, Plaintiff was treated with Percocet, Flexeril, Madrol

Dosepak, Demerol, Vistaril, and Versed.  (*Id.*)

In March 2000, Dr. Nolan referred Plaintiff to Dr. Matthew Monsein at

Sister Kenny Institute for a chronic pain rehabilitation consultation.  (Tr. 260-63.)

During her treatment with Dr. Monsein, Plaintiff described a long history of

headaches, and a three-year history of neck pain varying from a level five to a

level ten out of ten and worsening headaches.  (Tr. 260.)  She reported that she

7

could not return to work because of her neck pain and headaches, and described

a typical day as getting up, getting her kids ready for school, and doing light

activities around the home.  (Tr. 261.)  Plaintiff admitted to a significant amount

of stress in her life.  (*Id.*)

Dr. Monsein's diagnostic impression of Plaintiff is reported as follows:

> 1.  Chronic headache syndrome, etiology probably a
> combination of factors including a history of chronic
> migraine headaches since childhood, a history of
> previous neck surgery with possible discogenic pain.

> 2.  Myofascial pain per physical examination.

> 3.  History of significant psychological trauma.

(Tr. 262.)  Dr. Monsein prescribed Atenolol to Plaintiff and also found Plaintiff to

be an appropriate candidate for the pain rehabilitation program, and noted that it

would be in Plaintiff's best interest to minimize or eliminate dependency on

narcotics in the long run.  (Tr. 262-63.)

In May 2000, Dr. Nancy Carlson administered the MMPI-2 test during a

psychological evaluation to Plaintiff.  (Tr. 254.)  The test produced a marginally

valid profile, indicating that Plaintiff may have had difficulty admitting even minor

flaws, or was naive in her view of herself.  (*Id.*)  Notably, individuals with a similar

profile:

> . . . tend to present with multiple somatic complaints and
> symptoms of depression, anger, suspiciousness, and
> anxiety.  They are preoccupied with physical
> functioning, deny good health, and have a wide variety
> of somatic complaints.  They indicate they feel

8

depressed, unhappy, nervous, lack energy, and have
few interests . . .

(Tr. 254.)  Dr. Carlson recommended that there should be further evaluation of

the role of psychological factors in the experience and expression of Plaintiff's

pain.  (*Id.*)  In addition, after conducting an interview and mental status exam,

Dr. Carlson diagnosed pain disorder associated with both psychological factors

and a general medical condition; dysthymic disorder; partner relational problem;

and panic disorder without agoraphobia (provisional).  (Tr. 256-59.)

Also in May 2000, Plaintiff was referred to Dr. Kathryn Selmo at Sister

Kenny Institute for an evaluation of depression, insomnia, and anxiety.  (Tr. 247-

51.)  During this evaluation, Plaintiff described a chaotic and abusive childhood.

(Tr. 248.)  Plaintiff also admitted to a history of depression as a child, and current

depression with crying spells, feelings of hopelessness and helplessness,

increased irritability, difficulty sleeping, having low energy, and suicidal ideation

on and off.  (Tr. 247.)  In addition, Plaintiff complained of panic attacks and

generalized anxiety.  (Tr. 248.)  She reporting having psychological counseling

intermittently in the past few years, and also reported having adverse reactions

to antidepressants and medications for insomnia.  (*Id.*)

Dr. Selmo diagnosed Plaintiff with major depressive disorder, recurrent,

severe; panic disorder without agoraphobia; and pain disorder associated with

psychological factors and general medical condition.  (Tr. 249-50.)  She also

9

assigned Plaintiff a GAF[1] score of 55.  (Tr. 250.)  Dr. Selmo strongly encouraged

Plaintiff to seek individual, intense psychotherapy and recommended a low dose

of Celexa.  (Tr. 250-51.)

In follow-up with Dr. Monsein in August 2000, Plaintiff reported that her

thoracic pain was so severe that she had difficulty breathing, and that the pain

radiated up and down her spine and down both legs.  (Tr. 242.)  Dr. Monsein

ordered an MRI of her thoracic spine to rule out structural pathology.  (*Id.*)  The

following month, Plaintiff complained to Dr. Monsein of severe pain in the mid-

back region.  (Tr. 240.)  Her pain was located at the site of a small right disc

herniation at T7 and T8, confirmed by the MRI.  (Tr. 240, 264.)  Dr. Monsein

concluded that Plaintiff was neurologically intact, with good range of motion,

normal reflexes, and no motor or sensory deficits.  (Tr. 240.)  At that time,

Dr. Monsein stated:

> It is my impression that Ms. Jacobs does have a
> legitimate mechanical type problem in her mid thoracic
> region but I also feel that with Ms. Jacobs' underlying
> psychological makeup, that her tolerance for pain is
> quite low and as I put it, what is a 10 for her may be a 1,
> 2 or 3 for somebody else.

(Tr. 240.)

---

[1]      "[T]he Global Assessment of Functioning Scale is used to report 'the clinician's
judgment of the individual's overall level of functioning.'"  *Hudson ex rel. Jones     v.
Barnhart*, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (quoting the *Diagnostic and Statistical
Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) ("DSM-IV-TR")).  "GAF
scores of 51-60 indicate '[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or

(Footnote Continued on Next Page)

In both September and October 2000, Plaintiff went to an emergency room and received narcotic pain medication for neck pain.  (Tr. 267-69, 477.)  In October 2000, Plaintiff was referred to Psychologist Ewa Peczalaska for an evaluation regarding chronic pain management.  (Tr. 586.)  During the evaluation, Plaintiff reported feeling bored and depressed, and that she spent most of her time lying around and watching television.  (*Id.*)  Plaintiff also reported a history of childhood abuse, and abuse in her marriage that led to her neck injury.  (Tr. 587.)  But Plaintiff was not taking an antidepressant because she had a history of side effects with antidepressants.  (*Id.*)  Although Plaintiff stated her frustration with her pain and staying home, she was vague about committing to do physical exercise and returning to work.  (*Id.*)  Dr. Peczalaska diagnosed Plaintiff with pain disorder psychological/medical, and assessed a GAF score of 60.  (Tr. 587-88.)

Two weeks later, Plaintiff reported to Dr. Peczalaska that she was walking five days a week, two miles at a time, which she found invigorating and calming.  (Tr. 585.)  Then, in December 2000, Plaintiff reported to Dr. Peczalaska that she had experienced some improvement in her neck after physical therapy.  (Tr. 583.)  At that time, Plaintiff also agreed to collect some information about future employment for herself.  (*Id.*)  Later that month, Dr. Nolan noted that Plaintiff had significant functional improvement since starting physical therapy at Physicians

(Footnote Continued from Previous Page)
school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.*

Neck and Back Clinic.  (Tr. 337.)  However, the day after seeing Dr. Nolan,

Plaintiff went to the emergency room for treatment of a migraine headache with

nausea.  (Tr. 470.)  Plaintiff, at the time, was taking Stadol, Tylenol No. 3,

Neurontin, and Vistaril.  (*Id.*)  She was treated with Demerol, Vistaril, Toradol,

Tigan, Benadryl, and Versed before she felt able to go home.  (Tr. 471.)

On January 25, 2001, Dr. Nolan noted that Plaintiff's back was doing well,

and that she was exercising vigorously for about 30 minutes per day and was

continuing physical therapy.  (Tr. 335.)  He also noted that Plaintiff did not appear

depressed at that time.  (*Id.*)  Despite the noted improvement of her back,

Plaintiff was treated in an emergency room for migraines and neck pain in late

January and early February 2001.  (Tr. 265-66, 466-67.)

On February 23, 2001, Dr. Nolan noted that Plaintiff was increasing her

activities despite being under great stress after her husband moved out.

(Tr. 333.)  She had reported less neck pain, but was taking six Tylenol No. 3 a

day, which was more than prescribed.  (*Id.*)  Plaintiff was also taking Neurontin,

Vistaril, Ativan, and Stadol.  (*Id.*)  Dr. Nolan told Plaintiff that he wanted her to cut

down on her use of Stadol spray for treatment of migraines.  (*Id.*)  He also

strongly recommended that Plaintiff reconsider use of an antidepressant if

symptoms were not improving.  (*Id.*)

On March 12, 2001, Plaintiff presented to Dr. Nolan "with a dramatic

increase in stress and decrease in functional activities."  (Tr. 331.)  Dr. Nolan

12

diagnosed cervical and thoracic back pains, migraine recurrence, depression with panic attacks, anxiety, and chronic pain syndrome at that time.  (*Id.*)  He declined Plaintiff's request for an increase in her medication and strongly recommended that she consider an antidepressant, continue physical therapy, and continue psychological counseling.  (*Id.*)

The next day, Plaintiff saw Dr. John Beall at Allina Medical Clinic. (Tr. 835.)  Plaintiff reported being concerned about increased pain and increased difficulty sleeping because of the pain.  (*Id.*)  On examination, Plaintiff had markedly decreased range of motion of her neck and back, and diffuse tenderness in her back.  (*Id.*)  Dr. Beall referred Plaintiff to a pain clinic and ordered MRIs.  (*Id.*)  The MRI of her lumbar spine showed mild degenerative changes.  (Tr. 837.)

Three days later, on March 16, 2001, Plaintiff went to the emergency room with a migraine.  (Tr. 463.)  Her headache was treated with Demerol, Vistaril, and Ativan.  (Tr. 464.)  Then, on March 27, 2001, Plaintiff saw Dr. Beall for her persistent headaches; he prescribed Percocet and Vistaril.  (Tr. 832.)  On April 2, 2001, Plaintiff saw Dr. Andrew Maas at the same clinic, and reported daily, severe headaches.  (Tr. 830-31.)  Dr. Maas gave Plaintiff some additional Percocet and Flexeril.  (Tr. 831.)  On April 12, 2001, Plaintiff saw Dr. Beall again. Plaintiff requested an injection of Demerol because the other medications (*i.e.*, Neurontin, Midrin, and Percocet) were not working.  (Tr. 826.)  Instead, Dr. Beall

gave her an injection of Toradol and Vistaril, along with a prescription for more Vistaril.  (*Id.*)

On May 15, 2001, Dr. John Knutson at United Pain Center saw Plaintiff at the request of Dr. Beall.  (Tr. 391.)  At that time, Plaintiff stated that her pain completely interferes with all of her activities of life, with the exception of household chores, for which pain interferes 90%.  (Tr. 392.)  Plaintiff reported that physical therapy at Physicians Neck and Back Clinic had significantly diminished her headaches.  (*Id.*)  Dr. Knutson assessed Plaintiff with myofascial pain syndrome and with having mixed headaches.  (Tr. 390.)  He prescribed Plaintiff Oxycontin and Oxycodone, and gave her OxyFast.  (*Id.*)  He recommended Zanaflex and physical therapy.  (*Id.*)

On June 6, 2001, Plaintiff went to an emergency room for treatment of a migraine.  (Tr. 461.)  She had taken Midrin and OxyFast without relief.  (*Id.*)  Plaintiff was treated with Inapsine and Benadryl, which completely resolved her headache.  (*Id.*)  The next day, Plaintiff saw Dr. Beall and complained of feeling very jittery and anxious.  (Tr. 820.)  She reported, however, that she was happy with what the Pain Clinic had done for her.  (*Id.*)  On examination, Dr. Beall noted that Plaintiff appeared somewhat anxious and that she had a visible tremor.  (Tr. 821.)  He prescribed Plaintiff Inderal and Ativan.  (*Id.*)

On June 22, 2001, Plaintiff saw Dr. Maas and reported an exacerbation of her neck pain.  (Tr. 819.)  On examination, Plaintiff appeared to be in pain and

her trapezius muscles were very tight and tender.  (*Id.*)  Although he gave

Plaintiff Oxycodone for an acute exacerbation of pain, along with Flexeril, Dr.

Maas noted his concern about Plaintiff's drug use and recommended not

prescribing additional narcotics without a note from the pain clinic indicating an

overall plan.  (*Id.*)

On June 26, 2001, Plaintiff saw Dr. Beall for the purpose of getting

something more for her pain.  (Tr. 818.)  On examination, Dr. Beall noted

decreased range of motion in Plaintiff's neck.  (*Id.*)  Dr. Beall referred Plaintiff to

the Pain Clinic.  (*Id.*)  Two days later, Plaintiff went to the Pain Clinic and

complained of increased neck pain and a headache.  (Tr. 386.)  At the time, she

had been taking Vistaril, Oxycontin, Oxycodone, and OxyFast.  (Tr. 387.)  She

was allowed to continue on Oxycontin and Oxycodone and was referred to

physical therapy.  (Tr. 387.)

On August 14, 2001, Plaintiff visited Dr. Beall.  Dr. Beall noted Plaintiff was

tapering off use of narcotics, and only wanted treatment for acute episodes.

(Tr. 817.)  Plaintiff was given a prescription for Percocet, Flexeril, and a Medrol

Dosepak for muscle spasms in her neck and the radiating pain down her arm.

(*Id.*)

On August 27, 2001, Plaintiff saw Dr. Knutson again.  (Tr. 378.)  She

reported having daily migraines and a fire-like tingling into her left arm and hand.

(*Id.*)  She also reported that her stress level had increased.  (*Id.*)  Dr. Knutson

noted that physical therapy would not be pursued at that time because it seemed to make things worse.  (Tr. 379.)  Dr. Knutson stated that there would be no change in Plaintiff's medications and noted that Plaintiff was off narcotics and that they wanted to continue to keep her off narcotics.  (*Id.*)

In mid-October, 2001, Plaintiff visited Dr. Beall for the persistent neck and back pain.  (Tr. 810.)  Dr. Beall prescribed Percocet for Plaintiff's neck and back pain, and urged her to restart her exercising.  (*Id.*)

On October 22, 2001, Plaintiff saw Dr. Peczalaska and reported that she had decreased the use of pain medications and had started exercising regularly. (Tr. 582.)  Plaintiff also said that she went back to school to become a veterinary clinical assistant, and was doing well in school.  (Tr. 582.)  However, she also reported being very stressed out in the last month due to serious family issues. (*Id.*)  Plaintiff saw Dr. Peczalaska again on October 31, 2001.  (Tr. 581.)  During this visit, Plaintiff reported missing a week of school after re-injuring her neck. (*Id.*)  Then, in December 2001, Plaintiff told Dr. Peczalaska that she was finishing her finals at school and was getting good grades.  (Tr. 580.)  However, Plaintiff also reported having more migraines and more neck pain and stress, which she attributed to her family situation.  (*Id.*)

### C.    Medical Treatment Subsequent to Plaintiff's Date-Last-Insured

Medical records after the claimant's date-last-insured are relevant to the disability analysis only if probative of her condition before her insured status

16

expired.  *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007.)  The following summary reflects Plaintiff's medical treatment and evaluations after her insured status expired; this shows ongoing treatment for severe pain, both physical and psychological, and the continuing prescription of an array of medication.

Plaintiff's high stress level and her neck pain and headaches continued in January 2002, and made it difficult for Plaintiff to do her schoolwork.  (Tr. 578-79.)  In February 2002, Dr. Beall referred Plaintiff to Dr. Jerone Kennedy at Neurology Associates, Ltd. for evaluation of numbness in the fingers and hands.  (Tr. 426.)  Sensory testing revealed patchy hypesthesia in the entire right hand.  (Tr. 426.)  MRIs were taken of Plaintiff's cervical and thoracic spine, and Dr. Kennedy found the results to be fairly unremarkable.  (Tr. 425.)

In February and March 2002, Plaintiff received treatment for headaches and neck pain in an emergency room.  (Tr. 453-55.)  Then, on March 25, 2002, Plaintiff was admitted overnight to Fairview Ridges Hospital for treatment of a headache.  (Tr. 349.)  While hospitalized, Dr. Rajiv Aggarwal examined Plaintiff and found multiple tender points meeting the criteria for fibromyalgia.  (Tr. 356.)  Dr. Aggarwal opined that Plaintiff's chronic headaches were likely from the fibromyalgia.  (*Id.*)  Dr. Aggarwal recommended treatment in a fibromyalgia clinic, among other things.  (*Id.*)

In early March, 2002, Plaintiff told Dr. Peczalaska that she quit school due to high stress and neck pain, but she hoped to go back.  (Tr. 577.)

17

Dr. Peczalaska encouraged Plaintiff to follow-up with pain management and to return to school.  (*Id.*)

In April 2002, Plaintiff was seen by Dr. John Hansen at the Pain Clinic. (Tr. 376-77.)  She explained to Dr. Hansen that pain medications helped her pain, but drained her ambition, making her depressed.  (*Id.*)  However, she explained that without pain medication she is cranky, has decreased activities of daily living, and ends up depressed.  (*Id.*)  Dr. Hansen gave Plaintiff a clonidine patch at that time.  (Tr. 377.)

Plaintiff saw Dr. Hansen again on May 6, 2002.  (Tr. 374-75.)  She was recovering from opiate withdrawal, and rated her pain at a level seven out of ten. (Tr. 374.)  The next day, Plaintiff saw Dr. Beall and got a refill of OxyFast for her headaches.  (Tr. 792.)  Plaintiff returned to Dr. Beall a week later having used all of her OxyFast.  (Tr. 791.)  At that time, Dr. Beall stated:

> A lot of her symptoms seem to be functional.  She overreacts to just about everything that is given to her. She is now stating that Neurontin at the higher doses is giving her chest tightness . . . . On exam, neck has actually been pretty good.

(*Id.*)  Dr. Beall then prescribed Plaintiff Percocet.  (*Id.*)  At the end of May, Plaintiff was given Oxycodone and Verapamil for her migraines.  (Tr. 789.)  And about ten days later, she was given Fiorinal and Oxycodone for her headaches. (Tr. 787.)  On June 13, 2002, Plaintiff again reported stress and increased neck pain.  (Tr. 784.)  She was prescribed Ativan and Oxycodone at that time.  (*Id.*)

18

On July 10, 2002, during a visit with Dr. Beall, Plaintiff reported having a very painful back on examination along with a positive straight leg raise test. (Tr. 779.)  Dr. Beall noted that her MRI showed some changes from the MRI done in February, and he referred her to a neurosurgeon for follow-up.  (*Id.*)  At that time, Plaintiff was no longer taking the OxyFast, but was taking Oxycodone. (*Id.*)  Dr. Beall also switched Plaintiff from taking Verapamil to Nortriptyline.  (*Id.*)

Also in July, Plaintiff went to an emergency room two days in a row for treatment of a migraine.  (Tr. 434, 437.)  On July 16, 2002, Plaintiff was given Zofran, and then repeated doses of Demerol.  (Tr. 438.)  Plaintiff was also given Toradol, Ativan, and Decadron.  (*Id.*)  The next day, Plaintiff was treated with morphine sulfate, Toradol, and Ativan.  (Tr. 435.)  A CT scan of her head was negative.  (Tr. 879.)  Dr. Michael Rock, the physician attending on the second day, indicated that he would not treat Plaintiff with Versed, a potent sedative not indicated for migraines, and which carries significant morbidity and monitoring needs.  (Tr. 435.)  On July 18, 2002, Plaintiff told Dr. Beall she had gone to the ER with headaches, but was not given any narcotics.  (Tr. 778.)  Dr. Beall then prescribed Oxycodone and Tigan.  (*Id.*)  Plaintiff continued to get refills of Oxycodone, MSContin, and Oxycontin through the end of September.  (Tr. 763-77.)

On July 31, 2002, Plaintiff was treated for narcotic withdrawal in an emergency room.  (Tr. 864-65.)  Several days later, she fainted and was taken to

19

an emergency room after falling and hitting her head.  (Tr. 856.)  The emergency room physician, Dr. Donald Brandt, reported that Plaintiff's husband had noted at the time that she had been confused over the last few days.  (*Id.*)  At that time, Dr. Brandt recommended that Plaintiff find a better way to handle her pain than with narcotics.  (Tr. 857.)  He diagnosed "[s]yncopal episode secondary to pain medications and tranquilizers."  (*Id.*)

In August 2002, Plaintiff returned to Dr. Kennedy after she had increasing pain and numbness caused by her previous fall.  (Tr. 424.)  Dr. Kennedy opined that the cause of Plaintiff's complaints was unclear.  (*Id.*)  When Plaintiff returned with continuing symptoms in September, 2002, Dr. Kennedy again opined that the cause of Plaintiff's complaints was unclear.  (Tr. 423.)  He noted that there was no obvious structural cause for Plaintiff's complaints.  (*Id.*)

An MRI taken on September 13, 2002, showed a degenerative change at C4 disc and that a disc protrusion had developed, and showed that a moderate sized disc herniation had developed at C6-7.  (Tr. 841.)  The physician who interpreted the radiology report concluded that the disc protrusion at C6-7 could affect the left C7 root, and the disc protrusion at C4-5 could affect the right C5 root if symptomatic.  (Tr. 842.)

Plaintiff then again saw Dr. Richard Foreman of Neurological Associates of St. Paul in early October 2002.  (Tr. 499.)  She complained of numbness in both

hands.  (*Id.*)  Dr. Foreman explained in a letter to Dr. Kennedy that an
electromyogram confirmed carpal tunnel syndrome.  (Tr. 500.)

On October 11, 2002, Plaintiff had an MRI of her cervical spine.  (Tr. 839-
40.)  It showed disc herniation at C4-5, distorting the exiting right ventral nerve
root.  (Tr. 840.)  It also showed a minimal disc bulge at C6-7, that "did not
definitely distort or compress the left exiting nerve roots," but it was
recommended to look for symptoms at this level.  (*Id.*)  Two days later, Plaintiff
was treated in an emergency room for neck pain with Flexeril, and anti-
inflammatory, and Percocet.  (Tr. 430.)

On October 23, 2002, Plaintiff had a hysterectomy.  (Tr. 758.)  About a
week later, she returned to Dr. Beall for a refill of her pain medications for
headaches and neck pain.  (Tr. 756.)  Plaintiff continued to see Dr. Beall for
refills through June 18, 2003.  (Tr. 736-48.)

In January 2003, Plaintiff saw Dr. Foreman for her low back pain.
(Tr. 498.)  After testing and examination, Dr. Foreman concluded that Plaintiff
had a normal left leg EMG and no neurologic abnormality was indicated.  (Tr.
507.)  An MRI of her lumbar spine also showed no significant disease.  (*Id.*)
Dr. Foreman noted that Plaintiff had been seen in a pain clinic and it was thought
that she might have fibromyalgia.  (*Id.*)

On August 13, 2003, Plaintiff saw Dr. Beall and complained of severe
abdominal pain over a three-day period.  (Tr. 906.)  After a CT scan and

21

treatment with Asacol, Plaintiff noted that she was much improved except for some left-lower quadrant abdominal pain.  (Tr. 905.)  On October 23, 2003, Dr. Beall opined that Plaintiff's abdominal pain was probably chronic constipation secondary to narcotic usage.  (Tr. 902.)  Plaintiff continued to treat her chronic pain with narcotics through April 2004, pursuant to a controlled substance agreement.  (Tr. 894-900.)

In April 2004, Dr. Beall completed a Medical Assessment of Ability to Do Work-Related Activities (Mental), a Physical Residual Functional Capacity Questionnaire, and a Fibromyalgia Residual Functional Capacity Questionnaire regarding Plaintiff.  (Tr. 589-603.)  Dr. Beall opined that Plaintiff generally had a good to very good ability to do mental work-related activities with the exceptions of dealing with work stress, and maintaining attention and concentration, which she would have poor to no ability to do.  (Tr. 589.)  Dr. Beall described Plaintiff's physical diagnoses as "chronic neck and back pain, fibromyalgia."  (Tr. 592.)  He also indicated that depression, anxiety, somatoform disorder, and other psychological factors affect Plaintiff's physical condition.  (Tr. 593.)  He opined that Plaintiff would need a job permitting shifting positions at will from sitting, standing or walking, and the ability to take 4-5 unscheduled breaks during a day. (Tr. 595.)  He indicated that although emotional factors contribute to the severity of Plaintiff's symptoms and functional limitations, she is not a malingerer. (Tr. 599.)

On June 3, 2004, Plaintiff was admitted to Fairview Recovery Services when she could not be awakened in the morning after she accidently took her medications twice.  (Tr. 604.)  At that time, Plaintiff identified with all seven of the DSM-IV criteria for substance dependence, but she denied being drug dependent because the medications were prescribed for her pain issues.  (Tr. 605.)  Plaintiff was discharged after a 72-hour hold and monitoring for withdrawal from opiates.  (Tr. 676.)  Jane Samuels, the inpatient psychotherapist who treated Plaintiff while in Fairview, opined that Plaintiff's mental health problems posed a significant impediment to her functioning, and seeking disability was an appropriate route for her to take.  (Tr. 733.)

From July 2004 through January 2005, Plaintiff continued to be treated for headaches, neck pain, and mood disorder.  (Tr. 849-51, 883-92, 924-27.)  Her recent MRIs indicate that her disc protrusions are not significant enough to be surgical.  (Tr. 888.)

### D.    Plaintiff's Testimony

At the October 11, 2005 hearing before the ALJ, Plaintiff testified that she suffers from severe depression and anxiety.  (Tr. 957.)  She worked briefly in 2001 cleaning apartments, making a total of $184.00, but that she stopped because it was too painful for her.  (Tr. 958.)  In addition, Plaintiff testified that before that she worked as a receptionist, but she had to leave that job because of frequent absences due to illness.  (Tr. 959.)  Plaintiff testified that during the

period around December 2001, she was having good days—allowing her about two hours of activity before needing a two to three hour break—about twice a week, and she was having bad days—meaning that she would get up and lay on the couch all day—three to four days a week.  (Tr. 965-66.)  Currently, Plaintiff has about two good days per week, and about five bad days per week.  (Tr. 966.)  Plaintiff also testified that stress magnifies her pain about ten times.  (Tr. 969.)  Regarding her medications, she testified that they help her pain somewhat, but also make her severely nauseous and tired.  (Tr. 955.)  Plaintiff's testimony reflects that she currently leads a fairly sedentary life, typically sitting all day watching television and sometimes driving her children to and from school.  (Tr. 956.)

### E.    Expert Testimony

Dr. Katherine Hiduchenko appeared and testified as a medical expert at the hearing before the ALJ.  (Tr. 949, 982-89.)  The ALJ asked Dr. Hiduchenko what limitations she would place on Plaintiff if Plaintiff were to work prior to October 11, 2002.  (*Id.*)  Dr. Hiduchenko testified that Plaintiff would need something between light and sedentary work, with a restriction of lifting ten pounds occasionally, less than ten pounds more frequently, freedom to get up at her convenience, and having no repetitive work with her right hand as a constant requirement.  (Tr. 986.)  Dr. Hiduchenko confirmed that it would be appropriate to describe the latter limitation as no repetitive fine fingering, and no power

24

gripping, twisting, or pounding.  (*Id.*)  She also stated Plaintiff would need

restrictions of only occasional bending, stooping, and crouching.  (*Id.*)  And she

agreed that the restrictions that she listed dealt only with Plaintiff's physical

limitations, not psychological.  (Tr. 987.)

Norman Mastbaum testified as a vocational expert at the hearing.

(Tr. 949, 989-94.)  The ALJ posed the following hypothetical to Mastbaum:

> Assume we have an individual who at onset was 29, with a high
> school plus education, work experience as outlined by yourself at
> 18E, who's on a number of medications, the only apparent side
> effects being some nausea and tiredness, who's impaired with
> obesity, degenerative disc disease with herniation, who suffers from
> chronic pain, possible fibromyalgia and possible somatoform
> disorder, who suffers from migraines, right carpal tunnel syndrome,
> colitis, depression with anxiety, and said individual is limited to lifting
> and carrying 10 pounds occasionally, 5 pounds frequently, can do
> work that allows for a change of position at will, where there would
> be no repetitive rotation, fixation, flexation or extension of the neck .
> . . . Let's say no repetitive rotation, repetitive fixation, repetitive
> flexation, repetitive extension of the neck, okay?  It can be done
> intermittently, but not repetitively.  Said individual could have no
> power gripping, twisting, pounding or repetitive fine fingering on the
> right, which is the dominant hand, by the way.  No exposure to
> temperature and humidity extremes, heights, ladders or scaffolding.
> Only occasional bending, stooping, crouching, crawling, twisting or
> over shoulder work.  And must work in a low stress environment,
> where minimal industrial standards for production and pace are
> applicable.  Could such a person do any work that Claimant's
> previously done?

(Tr. 990-91.)  Mastbaum testified that it was "quite possible that the entire past

relevant work would be excluded," but that he believed there was "other work

that would provide for the RFC that [the ALJ] [had] . . . offered."  (Tr. 991.)

Specifically, Mastbaum testified that such a person could perform other work,

such as identification clerk, information clerk, and call-out operator.  (Tr. 991-92.)

The ALJ then posed the following second hypothetical to Mastbaum:

[A]gain assume a similar individual, however, this time the individual
would be absent from the workplace more than four days a month,
pain would severely interfere with attention and concentration on a
frequent basis.  The individual would be capable – incapable of even
low stress work.  The individual would have to sit and stand a
maximum of 20 minutes at any one time, would be on one's feet a
maximum of 2 hours out of 8, would have to change their position at
least every 15 minutes, would have to take unscheduled breaks at
least four to five times a day of 15 minutes each, could use hands –
the right hand only 5 percent of a day's work in grasping, turning and
twisting, the left only 10 percent of the day for the same functions,
and fine manipulations for the fingers on the right only 5 percent of
the day, and the left only 10 percent.  Would have work where there
would be absolutely no stooping or crouching.  Would have poor to
no ability to deal with work stresses or to maintain concentration and
attention.  Would there be any work in the regional or national
economy for such a person?

(Tr. 992-93.)  Mastbaum answered, "No.  Those conditions would preclude

employment."  (Tr. 993.)

## F.    The ALJ's Decision

On December 15, 2005, the ALJ issued an unfavorable decision to

Plaintiff, finding that Plaintiff was not disabled.  (Tr. 15-26.)  In so doing, the ALJ

followed the sequential five-step procedure as set out in the rules.  *See* 20

C.F.R. § 404.1520(a)-(f).  The Eighth Circuit has summarized these steps as

follows: (1) whether the claimant is currently engaged in "substantial gainful

activity"; (2) whether the claimant suffers from a severe impairment that

"significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform the past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation, the ALJ concluded that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date of disability.  (Tr. 19.)  At the second step of the evaluation, the ALJ found that Plaintiff is severely impaired by the following:

> [O]besity, degenerative disc disease with herniation, a
> chronic pain syndrome, possible fibromyalgia, possible
> somatoform disorder, migraine headaches, right carpal
> tunnel syndrome, colitis, depression, and anxiety.

(*Id.*)  At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20.)  The ALJ did find, however, that Plaintiff "has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate limitations in concentration, persistence, or pace, no episodes of decompensation[] of

extended duration, and no evidence of the C criteria of the listings (i.e., repeated episodes of decompensation, each of extended duration, predicted episodes of decompensation with even minimal increases in mental demands or change in the environment, or inability to function outside a highly supportive living arrangement)."  (Tr. 20.)

At step four of the evaluation, the ALJ found Plaintiff to have a residual functional capacity "to perform a modified range of sedentary work involving occasionally lifting up to ten pounds, frequently lifting up to five pounds, an at will change of position, no repetitive rotation, repetitive fixation, repetitive flexation, or repetitive extension involving the neck, no power gripping, pounding, twisting, or fine fingering involving the right hand, no exposure to extremes of temperature and/or humidity, no work around heights, ladders, or scaffolding, only occasional bending, twisting, stooping, crouching, crawling, or overhead shoulder work, and work which is low stress involving minimal industrial standards.  (Tr. 21.)  Based on the testimony of the vocational expert, the ALJ determined that Plaintiff could not perform her past relevant work.  (Tr. 24.)

At the fifth step of the evaluation process, the ALJ, again based on the vocational expert's testimony, concluded that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.  (Tr. 24.)  Thus, based on those findings, the ALJ concluded that Plaintiff did not meet the statutory criteria for a finding of disability, and therefore was not entitled to a

period of disability or disability insurance benefits under the Social Security Act.
(*Id.*)

## II.   STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability
benefits may be awarded.  "Disability" under the Social Security Act means the
"inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  "An
individual shall be determined to be under a disability only if his physical or
mental impairment or impairments are of such severity that he is not only unable
to do his previous work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work which exists in
the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability
benefits to a claimant is limited to a determination of whether the decision of the
Commissioner is supported by substantial evidence on the record as a whole.
42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There
is a notable difference between 'substantial evidence' and 'substantial evidence
on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.
1987).  Substantial evidence is "more than a mere scintilla.  It means such
relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations
omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001)
("Substantial evidence is less than a preponderance, but enough that a
reasonable mind might accept it as adequate to support a decision.").
"'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing
analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in
reviewing administrative findings is more than a mere search of the record for
evidence supporting the [Commissioner's] findings." *Id.* In reviewing the
administrative decision, "'[t]he substantiality of evidence must take into account
whatever in the record fairly detracts from its weight.'" *Id.* (citing *Universal
Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not
substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210,
1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision
merely because evidence may exist to support the opposite conclusion. *Mitchell
v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213
(concluding that the ALJ's determination must be affirmed, even if substantial
evidence would support the opposite finding). Instead, the Court must consider
"the weight of the evidence in the record and apply a balancing test to evidence
which is contradictory." *Gavin*, 811 F.2d at 1199. The possibility that the Court
could draw two inconsistent conclusions from the same record does not prevent

a particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits and supplemental security income under the Social Security Act.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

**III.   DISCUSSION**

Plaintiff alleges several errors in the ALJ's evaluation of her disability claim.  First, Plaintiff argues the ALJ erred in not granting greater weight to Dr. Beall's opinion of her residual functional capacity contending it is supported by objective findings and evidence that Plaintiff suffers from severe pain.  Second, Plaintiff alleges the ALJ erred by:  (1) discrediting her subjective complaints based on lack of objective medical evidence; (2) ignoring evidence that Plaintiff sought treatment for her conditions; (3) exaggerating Plaintiff's daily activities; and (4) improperly evaluating Plaintiff's work record.  Third, Plaintiff contends

that the ALJ's decision that Plaintiff could perform other work was based on a faulty hypothetical question posed to the vocational expert.

Defendant, on the other hand, supports the ALJ's decision asserting that Dr. Beall's opinion was too remote because it was given three years after December 2001, Plaintiff's date-last-insured.  Defendant also argues that the ALJ's analysis of Dr. Beall's opinion was appropriate because there was no showing of neurological deficits or loss of extremity function to support Plaintiff's complaints of pain, but there was evidence that Plaintiff's pain improved with exercise and physical therapy.  And with respect to Dr. Beall's opinion that Plaintiff would have poor to no ability to maintain attention and concentration, Defendant points out, as the ALJ did, that Plaintiff attended school and got good grades.  In addition, Defendant contends that the ALJ reasonably found that the limitations proposed by Dr. Beall in his fibromyalgia assessment lacked detailed clinical support and were internally inconsistent.

Further, Defendant asserts that the ALJ properly evaluated Plaintiff's credibility according to the *Polaski* factors.[2]  Specifically, Defendant points out that the ALJ considered Plaintiff's daily activities, her improvement with physical

---

[2]     *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (requiring the administrative factfinder to examine such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the paint; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions).

therapy and exercise, her failure to continue in a pain clinic after she was denied

narcotic medication, and the sporadic counseling for her mental impairments.


### A.     Evaluating the Physicians' Opinions

A treating physician's opinion is typically entitled to controlling weight if it is

"well-supported by medically acceptable clinical and laboratory and diagnostic

techniques" and not inconsistent with other substantial evidence in the record.

*Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*,

201 F.3d 1010, 1012-13 (8th Cir. 2000)).  "An ALJ may discount such an opinion

if other medical assessments are supported by superior medical evidence, or if

the treating physician has offered inconsistent opinions."  *Holmstrom v.*

*Massanari*, 270 F.3d 715, 720 (8th Cir. 2001).  "A non-treating physician's

assessment does not alone constitute substantial evidence if it conflicts with the

assessment of a treating physician."  *Lehnartz v. Barnhart*, 142 Fed. Appx. 939,

942 (8th Cir. 2005).

If an ALJ determines not to grant controlling weight to a treating

physician's opinion, medical opinions are further evaluated under the framework

described in 20 C.F.R. § 404.1527.  Under such framework, the ALJ should

consider the following factors in according weight to medical opinions:  (1)

whether the source has examined the claimant; (2) the length of the treatment

relationship and the frequency of examination; (2) the nature and extent of the

33

treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the source is also a specialist.  20 C.F.R. § 404.1527(d).

Dr. Beall, one of Plaintiff's treating physicians, found Plaintiff's limitations to be greater than did Dr. Hiduchenko, the testifying medical expert.  Plaintiff asserts that the ALJ improperly discounted Dr. Beall's opinions regarding Plaintiff's limitations from mental impairments, physical impairments, and fibromyalgia, because the ALJ did so without citing any examples of inconsistencies in the record.  In addition, Plaintiff contends the ALJ erred by granting the medical expert's testimony greater weight than her treating physician's opinion without addressing why the medical expert's opinion was superior to Dr. Beall's opinion.  Plaintiff acknowledges that there is no way to objectively measure the severity of her pain, but points to evidence of herniated discs, limitation of range of motion, a positive straight-leg-raise test, and a tender-point count as objective evidence of pain-producing conditions.

The ALJ stated the following regarding Dr. Beall's opinion:

Dr. Beall, the claimant's treating physician, has provided opinions regarding the claimant's residual functional capacity which would be inconsistent with the ability to perform full-time employment.  It was the opinion of Dr. Beall that the claimant's pain would frequently interfere with attention and concentration, she was incapable of even low stress work, could sit for less than two hours in an eight-hour workday, stand/walk for less than two hours in an eight-hour workday, would require unscheduled breaks during an eight-hour workday, and would be expected to miss work more than four times a month, with poor or no ability to deal with work stresses, and/or maintain attention/concentration . . . . Dr. Beall's opinion regarding

34

the claimant's inability to work is clearly based on her allegations of pain and fatigue which have not been well supported by the overall evidence of record.  As Dr. Beall's opinion is not supported by clinical findings, laboratory diagnostic techniques, and is not consistent with other substantial evidence of record, the undersigned is not giving controlling weight to this opinion of a treating physician.

(Tr. 23.)  This Court concludes that the ALJ's analysis of Dr. Beall's opinion is inadequate.

Dr. Beall stated in the "Medical Assessment of Ability to Do Work-Related Activities (Mental)" questionnaire, that "chronic pain and medications interfere[]" with Plaintiff's ability to deal with work stresses and maintain attention and concentration.  (Tr. 589.)  And in the "Physical Residual Functional Capacity Questionnaire," Dr. Beall indicated that drowsiness is a side effect from Plaintiff's medications that may impact her ability to work.  (Tr. 592.)  The record reflects that during the relevant time period of 1997 through December 31, 2001, Plaintiff's medications, including those provided in emergency room care, have included Ibuprofen, Flexeril, Demerol, Vistaril, Toradol, Stadol, Vicodin, Versed, Neurontin, Ativan, Percocet, Valium, Orudis, Trazodone, Decadron, Phenergan, morphine, Atenolol, Soma, Buprenex, Celexa, Tigan, Benadryl, Tylenol No. 3, Oxycontin, Oxycodone, OxyFast, Midrin, Inapsine, Inderal, and Medrol Dosepak. Plaintiff's frequent treatment with powerful narcotic pain medications and other medications is evidence that supports Dr. Beall's opinion, and supports Plaintiff's subjective complaints of pain.  *See O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th

35

Cir. 2003) (stating that "'consistent diagnosis of chronic . . . pain, coupled with a long history of pain management and drug therapy' was an 'objective medical fact' supporting a claimant's allegations of disabling pain") (quoting *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998)).

Dr. Beall also indicated that depression, somatoform disorder, and anxiety affect Plaintiff's physical condition.  (Tr. 593.)  This opinion is supported by: (1) Plaintiff's MMPI-2 test results, which indicate a person preoccupied with somatic complaints and physical functioning; (2) Drs. Carlson, Selmo, and Peczalaska's diagnoses of pain disorder with psychological and medical factors; (3) Dr. Monsein's opinion that Plaintiff's underlying psychological makeup causes a low pain tolerance and; (4) Dr. Nolan's observations of stress contributing to Plaintiff's pain, and her tendency toward over-somatization.  (Tr. 240, 254, 331, 337, 587-88.)  This evidence is also consistent with Dr. Beall's opinion that Plaintiff's chronic pain and medications would cause her to have poor to no ability to maintain attention and concentration or deal with work stress.  (Tr. 589.)

The MRIs of Plaintiff's neck during the relevant time period did not indicate nerve root impingement, but did indicate degenerative changes and disc herniation.  (Tr. 264, 318, 425, 840.)  There were also clinical findings of muscle spasm in Plaintiff's neck on examination.  (Tr. 285, 303, 314.)  Although the medical expert opined that these objective findings support a less restrictive residual functional capacity than Dr. Beall assigned Plaintiff, the medical expert

also testified that she was strictly limiting her discussion to the "physical" aspects of the case.  (Tr. 986.)

It was error for the ALJ to not analyze this difference in the treating physician's and medical expert's opinions because an ALJ is not free to ignore a psychological origin of pain.  *See Pratt v. Sullivan*, 956 F.2d 830, 835-36 (8th Cir. 1992) (stating that the ALJ's failure to consider effects of mental impairments in combination with the effects of physical impairments in determining residual functional capacity violates the Social Security Act and constitutes reversible error); *see also Benson v. Heckler*, 780 F.2d 16, 18 (8th Cir. 1985) (stating that "[t]his circuit has consistently held that an ALJ may not ignore evidence of a psychological origin of pain," and remanding for ALJ to evaluate the appellant's somatization and functional disorders under Listing 12.07).  It is not sufficient that the ALJ considered Plaintiff's mental impairments separately and concluded her mental impairments cause only mild to moderate limitations in Plaintiff's work-related abilities, because in this case the record reflects that Plaintiff's physical and mental impairments were intertwined.  Thus, remand is required to allow for the ALJ to consider evidence concerning the psychological origin of Plaintiff's pain level.

   **B.    Credibility Analysis and Determination of Plaintiff's Residual Functional Capacity**

Although this Court concludes that remand is required for the reasons stated above, this Court will also address whether the ALJ's credibility analysis was proper in order for remand instructions to be complete.  In determining a claimant's residual functional capacity ("RFC"), the regulations require the ALJ to consider how all of the claimant's impairments, including any symptoms such as pain, cause physical and mental limitations that may affect the ability to work. *See* 20 C.F.R. § 404.1545.  "The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations." *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  The ALJ must consider a claimant's subjective complaints of pain, including "'the claimant's prior work record, and observations by third parties and treating and examining physicians relating to . . . 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; [and] 5. functional restrictions.'" *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (quoting *Polaski*, 729 F.2d at 1322).  The ALJ must take these factors into account, but does not need to discuss how each factor relates to plaintiff's credibility.  *Id.* (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)).  "The ALJ may discount subjective complaints of pain if they are inconsistent with the evidence as a whole." *Id.*

38

This Court addressed Plaintiff's treating physicians' opinions and Plaintiff's consistent treatment with strong pain medications above.  Those factors support Plaintiff's credibility regarding her asserted pain.  The ALJ, however, did not acknowledge this.  Although there is also evidence that detracts from Plaintiff's credibility—including records documenting that Plaintiff experienced some improvement from physical therapy and counseling, which may have been a contributing factor to Plaintiff's ability to succeed in school, and records indicating that Plaintiff became dependent on prescribed opioid medication, which might have motivated Plaintiff to not wholeheartedly engage in physical therapy, counseling, and other pain management techniques—this case nonetheless presents a complicated credibility issue.  The ALJ must do more than cite some evidence detracting from Plaintiff's credibility.  *See Cline v. Sullivan*, 939 F.2d 560, 569 (8th Cir. 1991) ("*Polaski* requires an examination of five factors in such cases and a discussion in the record of the relation of those factors to the evidence.").  On remand, the ALJ should explain how she balanced these factors in light of the record as a whole.

## V.     RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 24) be

**GRANTED**, and the case be remanded for further proceedings consistent with

this Report and Recommendation; and

2.      Defendant's Motion for Summary Judgment (Doc. No. 23) be

**DENIED**.


Date: January 7, 2009                    __*s/Jeffrey J. Keyes*_____
                                         JEFFREY J. KEYES
                                         United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**January 21, 2009**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within ten days after service thereof.  A judge shall make a
de novo determination of those portions to which objection is made.  This Report
and Recommendation does not constitute an order or judgment of the District
Court, and it is therefore not appealable to the Court of Appeals.